# 24-1221

*To Be Argued By:*
ALEXANDRA A.E. SHAPIRO

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

———— ◆ ◆ ————

MARK JOHNSON,

*Petitioner-Appellant,*

—against—

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PETITIONER-APPELLANT

ALEXANDRA A.E. SHAPIRO
JASON A. DRISCOLL
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880
ashapiro@shapiroarato.com
jdriscoll@shapiroarato.com

*Attorneys for Petitioner-Appellant*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

ARGUMENT ................................................................................... 2

I.   The Misappropriation Theory Was Foreclosed As A Matter Of Law ........... 2

    A.   The Government Ignores Binding Precedent And Misrepresents The Governing Legal Standards Regarding Fiduciary Status ............... 3

        1.   The Government Ignores Clear Circuit Law ................................ 3

        2.   The Government Ignores Recent Supreme Court Decisions Abrogating Vague Tests For Fiduciary Status ........................... 4

        3.   The Government's Caselaw Is Inapposite ................................. 6

    B.   The Evidence Foreclosed A Relationship Of Trust And Confidence As A Matter Of Law ........................................................ 6

        1.   The Contracts Expressly Disclaim Any Duty ............................ 7

            a.   The Agreements Are Not Mere Boilerplate ........................ 7

            b.   The Parties' Agreements Govern In A Criminal Case .......... 9

        2.   The Confidentiality Agreement Cannot Establish A Fiduciary Relationship .................................................. 11

            a.   The NDA Did Not Govern The FX Transaction ................ 11

            b.   HSBC Never Violated The NDA ...................................... 14

        3.   The Parties' Arm's-Length Relationship Further Forecloses Any Duty ................................................................ 17

            a.   Cairn Was A Sophisticated, Well-Advised Counterparty .......................................................... 17

i

b.   HSBC Did Not Control Cairn Or Its Assets........................19

c.   Cairn Withheld The Relevant Information.........................21

4.   The Government Has No Persuasive Responses To Johnson's Remaining Arguments .................................22

C.   Disclosure Forecloses Liability Under The Misappropriation Theory ............................................................24

II.  Even If The Misappropriation Theory Was Legally Valid, There Is Overwhelming Doubt As To Whether The Jury Would Have Convicted On Misappropriation Alone ..........................................27

A.   The Government And The District Court Applied An Incorrect Harmless Error Standard .......................................27

B.   The Government's Arguments At Trial Underscore Harmfulness ............................................................29

C.   The District Court Itself Expressed Doubt As To The Misappropriation Theory, Which This Court Confirmed When Granting Bail Pending Appeal .............................................30

D.   The Jury's Verdict Shed No Light On Misappropriation ...................30

CONCLUSION .......................................................32

## <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*Allen v. Credit Suisse Sec. (USA) LLC,*
   895 F.3d 214, 220 (2d Cir. 2018) ....................................................................20

*Brecht v. Abrahamson,*
   507 U.S. 619 (1993) ........................................................................................28

*Carpenter v. United States,*
   484 U.S. 19 (1987) ............................................................................................6

*Ciminelli v. United States,*
   598 U.S. 306 (2023) ..............................................................................9, 22, 31

*Colotti v. United States,*
   71 F.4th 102 (2d Cir. 2023) ......................................................27, 28, 30, 31

*Economy v. Borg-Warner Corp.,*
   829 F.2d 311 (2d Cir. 1987) ...........................................................................18

*Gomez v. United States,*
   87 F.4th 100 (2d Cir. 2023) ............................................................................28

*Hedgpeth v. Pulido,*
   555 U.S. 57 (2008) ..........................................................................................29

*In re Mid-Island Hosp., Inc.,*
   276 F.3d 123 (2d Cir. 2002) ...........................................................................17

*Kassir v. United States,*
   3 F.4th 556 (2d Cir. 2021) ..............................................................................28

*Kirschner v. Bennett,*
   648 F. Supp. 2d 525 (S.D.N.Y. 2009) .............................................................9

*Negrete v. Citibank, N.A.,*
   759 Fed. Appx. 42 (2d Cir. 2019) ..................................................................19

*Percoco v. United States,*
   598 U.S. 319 (2023) ..........................................................................................5

iii

*Phillips v. Audio Active Ltd.*,
    494 F.3d 378 (2d Cir. 2007) .................................................2

*Skilling v. United States*,
    561 U.S. 358 (2010) ......................................................4, 6

*Stone v. United States*,
    37 F.4th 825 (2d Cir. 2022) .................................27, 28, 30

*United States v. Afriyie*,
    929 F.3d 63 (2d Cir. 2019) ..............................................6

*United States v. Carr*,
    557 F.3d 93 (2d Cir. 2009) .............................................24

*United States v. Chestman*,
    947 F.2d 551 (2d Cir. 1991) .....................................passim

*United States v. Chow*,
    993 F.3d 125 (2d Cir. 2021) ......................................16, 17

*United States v. Gayle*,
    342 F.3d 89 (2d Cir. 2003) ..............................................2

*United States v. Hoskins*,
    44 F.4th 140 (2d Cir. 2022) ............................................19

*United States v. Johnson*,
    945 F.3d 606 (2d Cir. 2019) .................................16, 24, 26

*United States v. Joseph*,
    542 F.3d 13 (2d Cir. 2008) .............................................29

*United States v. Kosinski*,
    976 F.3d 135 (2d Cir. 2020) ......................................10, 17

*United States v. Litvak*,
    889 F.3d 58 (2d Cir. 2018) .......................................18, 21

*United States v. Lupton*,
    620 F.3d 790 (7th Cir. 2010) ..........................................10

iv

*United States v. Mattis*,
  963 F.3d 285 (2d Cir. 2020) ...............................................................30

*United States v. Miller*,
  997 F.2d 1010 (2d Cir. 1993) ..........................................................4, 9

*United States v. Milovanovic*,
  678 F.3d 713 (9th Cir. 2012) ...............................................................3

*United States v. Napout*,
  963 F.3d 163 (2d Cir. 2020) .................................................................4

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ......................................................................6, 25

*United States v. Sabhnani*,
  599 F.3d 215 (2d Cir. 2010) ...............................................................29

*United States v. Skelly*,
  442 F.3d 94 (2d Cir. 2006) ...............................................................4, 8

*Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*,
  661 F.3d 164 (2d Cir. 2011) .................................................................9

**Statutes**

18 U.S.C. § 666 .................................................................................10

28 U.S.C. § 2254 ..............................................................................27

**Rules**

17 C.F.R. § 240.10b5-2 .....................................................................16

v

## INTRODUCTION

The government concedes the first *coram nobis* factor is dispositive and the outcome of this appeal turns on its misappropriation theory. That theory was invalid as a matter of law, fact, and logic. It stretches the meaning of "relations of trust and confidence" beyond any knowable limit, in flat contradiction of this Court's warning against "broad expansion[s]" of such relationships in criminal cases. *United States v. Chestman*, 947 F.2d 551, 567 (2d Cir. 1991) (en banc).

There was nothing illegal or fraudulent about the FX trades at issue, and HSBC had no duty to refrain from making them. To the contrary, FX industry best practices "explicitly permit" the pre-hedging conduct the government calls "frontrunning" as a necessary means of mitigating transaction risk, as amicus ACI explains, and as Cairn understood. The government misapprehends the nature of the industry and commercial expectations. It claims the parties' nondisclosure agreement resolves the case. But the NDA couldn't create a duty specifically disclaimed by the parties' more relevant, governing agreements. Nor could the NDA impose a duty where the parties' arm's-length status also negated any such duty. Any other conclusion would violate this Court's directive to "tread cautiously in extending the misappropriation theory to new relationships" lest they "tak[e] over the whole corporate universe." *Id*.

1

That is sufficient to reverse the district court and grant *coram nobis* relief.
Moreover, even if the evidence did not foreclose a fiduciary-like relationship as a
matter of law, that evidence did not favor the government. Either way, Johnson is
entitled to a writ.

## **ARGUMENT**

## I.    **The Misappropriation Theory Was Foreclosed As A Matter Of Law**

The government argues "the key question … is whether there is grave doubt
as to whether the jury would have returned guilty verdicts had it been instructed on
the misappropriation theory alone." (GB23).[1] That is *one* question raised in this
appeal—a question the Court should answer in the affirmative. *See infra* Point II.
However, the government's opposition overlooks a separate threshold question
raised by Johnson's appeal—whether "[t]he misappropriation theory was
foreclosed as a matter of law," rendering the *Ciminelli* error necessarily harmful.
(OB27). It was. This question is not reviewed for abuse of discretion, because it
hinges on statutory and contract interpretation reviewed *de novo*. *See United
States v. Gayle*, 342 F.3d 89, 91 (2d Cir. 2003), *Phillips v. Audio Active Ltd.*, 494
F.3d 378, 384 (2d Cir. 2007).

---

[1] "GB," "OB," and "ACIB" refer to the government's, Johnson's, and amicus
ACI's briefs, and "SRA" to the reply appendix; other terms are defined in OB7n.1.

As Johnson's opening brief demonstrates, the misappropriation theory was invalid because the law forecloses any fiduciary-like relationship here.  (OB27, 30-35).  The district court thus committed legal error by concluding "it was a jury question … whether Johnson owed Cairn a heightened duty."  (SPA-17).  The misappropriation theory should never have been presented to the jury and thus presents no basis to deny *coram nobis* relief.  The government's opposition fails to demonstrate otherwise.

## A. The Government Ignores Binding Precedent And Misrepresents The Governing Legal Standards Regarding Fiduciary Status

The government's arguments rest on a fundamental misunderstanding about when fiduciary-like relationships can be implied.  The government ignores this Court's and the Supreme Court's binding precedent on the issue, and instead relies on an erroneous out-of-circuit decision.

### 1. *The Government Ignores Clear Circuit Law*

The government incorrectly posits that fiduciary-like relationships can be "informal"—that the "definition is broad, but intentionally so."  (GB26 (quoting *United States v. Milovanovic*, 678 F.3d 713, 722-723 (9th Cir. 2012) (en banc)).  It cites *Milovanovic*'s statement that the inquiry "is a fact-based determination that must ultimately be determined by a jury."  (GB26).  Not so.

*Milovanovic* is not the law of this Circuit, and the quoted language is incompatible with this Court's en banc decision in *Chestman*, which could not

3

have been clearer:  Courts must "tread cautiously in extending the misappropriation theory to new relationships," 947 F.2d at 567, because "an elastic and expedient definition of … relations of trust and confidence … has no place in the criminal law," *id.* at 570.  The Court reiterated this holding in *United States v. Miller*, 997 F.2d 1010, 1019 (2d Cir. 1993)*.*  Accordingly, Circuit law mandates that "a fiduciary obligation is not to be lightly implied, lest it undercut the basic principles of commercial law."  *United States v. Skelly*, 442 F.3d 94, 98 (2d Cir. 2006).

For these reasons, this Court has described *Milovanovic* as an example of courts that "have gone further" than this one in expanding the scope of fiduciary-like relationships.  *United States v. Napout*, 963 F.3d 163, 184 (2d Cir. 2020).  The Court should reject *Milavanovic*'s overbroad language—and the government's corresponding arguments.  The proof required for a fiduciary relationship is much higher, and absent here.

### 2. The Government Ignores Recent Supreme Court Decisions Abrogating Vague Tests For Fiduciary Status

The government also ignores the Supreme Court's recent further limitations on when fiduciary status can be implied.  It fails to contend with *Skilling v. United States*'s statement that the "existence of a fiduciary relationship" must be "beyond dispute" when required to prove federal fraud.  561 U.S. 358, 407 n.41 (2010) (identifying classic fiduciary relationships like "public official-public," "employer-

4

employee," and "union official-union members").  And it turns a blind eye to the fact that last year the Supreme Court extinguished any lingering possibility that fraud's fiduciary duty element could be satisfied based on malleable tests like the one the government proposes.

In *Percoco v. United States*, the Supreme Court held that even this Circuit's stricter "domination, control, and reliance" test for agency relationships was "too vague" to pass constitutional muster.  598 U.S. 319, 330 (2023).[2]  The Court held that fiduciary-like status is not proved merely because one party "leans very heavily" on the other's "recommendations," or because the latter "exercise[s] very strong influence over" the former's "decisions" or acts as a "wise counselor[]."  *Id.* at 330-31.  Disregarding *Percoco*, the government relies on exactly the factors the Supreme Court deemed "too vague."

Even though Johnson discussed these controlling precedents in his opening brief (OB29-30), the government ignores them.  But they foreclose the government's arguments, and underscore why the district court erred in concluding it properly submitted misappropriation to the jury.

---

[2] The jury instructions here used the vague test repudiated in *Percoco*.  (A-48 ("[A]t the heart of this relationship lies reliance and de facto control and dominance….")).

### 3. The Government's Caselaw Is Inapposite

The government likens this case to *Carpenter v. United States*, 484 U.S. 19 (1987), and *United States v. O'Hagan*, 521 U.S. 642 (1997), and other *securities* fraud precedents.  But those cases have no application here.

*Carpenter* involved an employee-employer relationship—one that is "inherently fiduciary" and implicates "hornbook fiduciary relations," *Chestman*, 947 F.2d at 568.  *O'Hagan* too involved a duty that was "beyond dispute," *Skilling*, 407 n.41, and fiduciary relationships with not just one but "two entities."  521 U.S. at 655 n.7 (attorney-client and employee-employer relationships).  And in *United States v. Afriyie*, the defendant traded on information from his investment firm employer concerning a potential acquisition of a publicly traded company.  His signed employment agreement confirmed his "employment … create[d] a relationship of confidence and trust"—another hornbook example.  929 F.3d 63, 68 (2d Cir. 2019).

### B.  The Evidence Foreclosed A Relationship Of Trust And Confidence As A Matter Of Law

The clear language of the contracts between HSBC and Cairn forecloses any fiduciary relationship as a matter of law.  (OB30-33).  The parties' arm's-length relationship further negates any fiduciary status.  (OB33-35).  The government dismisses these arguments in conclusory fashion because it has no legitimate response.  Instead, it incorrectly claims the NDA created a duty and repeats the

meritless argument that "more" sophisticated parties like HSBC owe fiduciary duties to "unsophisticated" parties like Cairn.  (GB29).

### 1.  The Contracts Expressly Disclaim Any Duty

The ISDA and Mandate Letter disclaim any fiduciary relationship in every conceivable manner.  (OB30-32).  The government does not dispute the unambiguous language in Cairn's and HSBC's agreements.  (GB3-4).  Nor does it dispute that the Mandate Letter is a valid agreement post-dating all other agreements between Cairn and HSBC and that it—and the incorporated ISDA— governed the execution of the FX transaction.  (GB7-8).  Instead, the government resorts to factually and legally incorrect arguments that contravene black-letter contract law and the plain meaning of the Mandate Letter.

### a.  The Agreements Are Not Mere Boilerplate

The government suggests—citing no controlling authority—that the agreements include mere "boilerplate disclaimers" (GB31) and that such "contractual term[s] in isolation" cannot "definitively resolve[] the question of fiduciary … status for purposes of criminal liability" (GB32).  But the ISDA's and Mandate Letter's disclaimers of fiduciary-like status are not mere boilerplate.  Nor do they represent "contractual term[s] in isolation."  Rather, these agreements and the expectations they give rise to are part of the fabric of the FX industry.  Indeed, these "[s]tandard ISDA disclaimers" are "widely upheld" and "viewed by banks

7

and dealers as essential to limiting their risk and defining their legal status as counterparties in capital markets." (ACIB13). For this reason, the relevant trade organization, The Financial Markets Association (ACI)—which "comprises 61 affiliated and independent national associations worldwide" (ACIB1)—has repeatedly appeared as an amicus throughout these proceedings and on direct appeal to express its profound discomfort with the government's position.

The government shakes off the ACI's position as irrelevant, but the parties' legitimate commercial expectations play a significant role in this Court's determination of fiduciary-like status—or the lack thereof. To adopt the government's view and reject the governing agreements and the parties' clear expectations would be to throw caution to the wind while contradicting the teachings of this Court and the Supreme Court. It would "undercut the basic principles of commercial law," *Skelly*, 442 F.3d at 98, this court has sought to protect when defining the limited scope of fiduciary-like relationships in misappropriation cases. Those commercial law principles include the "universally recognized standards of dealer conduct and longstanding banking custom and practice" (ACIB7) outlined by the ACI and relied upon by all FX industry actors.

The government's contrary view would "criminalize[] traditionally civil matters" and "make[] a federal crime of … deceptive actions traditionally left to

8

state contract and tort law—in flat contradiction with [the Supreme Court's] caution" not to.  *Ciminelli v. United States*, 598 U.S. 306, 315-16 (2023).

### b.  The Parties' Agreements Govern In A Criminal Case

The government has it backwards when it suggests contractual terms that might foreclose fiduciary duties in a civil case cannot determine the parties' relationship in a criminal case.  (GB32-33).  That argument flies in the face of this Court's clear *en banc* holding to the contrary:  "Useful as … an elastic and expedient definition of confidential relations … may be in the civil context, it has no place in the criminal law."  *Chestman*, 947 F.2d at 570; *accord Miller*, 997 F.2d at 1019.  The applicable standards are therefore *more restrictive* here than they would be in a civil case, and they foreclose any fiduciary-like relationship.

Ignoring that authority, the government does not even attempt to address the overwhelming precedent cited in Johnson's opening brief holding that "there is no factual issue" as to any fiduciary relationship where, as here, the parties "expressly disclaimed any sort of advisory, brokerage, or other fiduciary relationship."  *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 174 (2d Cir. 2011); *see also Kirschner v. Bennett*, 648 F. Supp. 2d 525, 534-35 (S.D.N.Y. 2009) (Lynch, J.) (no "fiduciary relationship" where FX transaction documents disclaimed "fiduciary" or "advisor" relationship).  It hopes

the Court will also disregard that precedent, which squarely forecloses any fiduciary-like relationship here.

The government's case, *United States v. Kosinski*, 976 F.3d 135 (2d Cir. 2020), provides no basis to hold otherwise. It involved a materially different context—insider-trading fraud prohibited by the Securities Exchange Act. Kosinski, a physician conducting clinical drug trials, signed NDAs with a pharmaceutical company, including one requiring him "to maintain in 'strict confidence' all the information with which he was provided to enable him to perform as principal investigator." *Id.* at 140. But when he learned patients had suffered allergic reactions, he sold and shorted the company's stock before the information became public. *Id.* at 141. This Court was inclined to overlook the NDA's "independent contractor" reference and civil breach of fiduciary duty law, because of policy "considerations as strong as those underlying the prohibition against insider trading in the Exchange Act." *Id.* at 148. No such considerations are present here. Quite the opposite: Congress specifically exempted FX transactions from the Commodity Exchange Act's fraud provisions—a fact the government further ignores. (*See* OB42; ACIB21-24; CA2 Dkt.73 at 21-22).[3]

---

[3] The government's other case, *United States v. Lupton*, is even further afield. 620 F.3d 790 (7th Cir. 2010) (contract describing defendant as "independent contractor" did not disprove he was "agent" under 18 U.S.C. § 666(d)(1)).

Because the ISDA and Mandate Letter foreclose any fiduciary-like relationship as a matter of law, Johnson is entitled to *coram nobis* relief.

### 2. The Confidentiality Agreement Cannot Establish A Fiduciary Relationship

While asking the Court to disregard the ISDA and Mandate Letter, the government claims an NDA that did not even govern the execution of the FX transaction somehow created a fiduciary relationship. It falsely contends the NDA imposed an "affirmative obligation" on HSBC not to use Cairn's information during the FX transaction, and that this obligation modified the ISDA's prior terms and the Mandate Letter's later, more specific terms governing the transaction. (GB32). This makes no sense as a matter of law, fact, or logic, which is why the district court properly rejected the argument below.

### a. The NDA Did Not Govern The FX Transaction

The ISDA—which the Mandate Letter incorporated—provides that the "Relationship Between Parties" may be modified only by "a written agreement … that expressly imposes affirmative obligations to the contrary *for that [t]ransaction*." (A-261 (emphasis added)). "Transaction" is a well-defined term in the ISDA and unambiguously refers to the ultimate FX transaction agreed to in the parties' October 24, 2011 Mandate Letter and executed pursuant to Cairn's December 7, 2011 instructions.

11

In contrast, the subject of the NDA was confidential information provided "for the purposes … set out in the RFP" (A-166 §1(ii))—*i.e.*, "to assist the [] banks in their *analysis* of the proposed currency exchange transaction," so Cairn could "[o]btain feedback" before "select[ing]" a bank (A-169, A-172) (emphasis added). The government ignores this limited purpose and falsely suggests the NDA governed how HSBC could *execute* the ultimate FX transaction months later. The government has it backwards. Cairn selected HSBC to carry out the FX transaction. While the NDA governed the parties' relationship during that limited selection process, the terms by which HSBC was to carry out the ultimate FX transaction after Cairn selected HSBC were governed exclusively by the Mandate Letter and incorporated ISDA.[4]

Notably, the district court rejected the government's argument. The district court *did not rely* on the NDA's terms and *did not conclude* that the NDA imposed any affirmative obligations on HSBC regarding the FX transaction at issue. (SPA-19). Nor did it conclude that the NDA modified the ISDA. (*Id.*). To the contrary, it concluded the NDA did not govern "the FX transactions that were the subject of

---

[4] NDA Section 7, providing it "shall remain in full force and effect … until two years after" its execution (A-167), does not somehow expand the NDA's scope to cover the execution of the transaction and certainly cannot modify the obligations imposed by the parties' *later agreements*, such as the Mandate Letter.

the RFP process" (*id.*)—as opposed to the RFP process itself. That conclusion was correct, as the clear terms of the parties' agreements negated any other conclusion.

The government's position also fails a basic logic test. The essence of its argument is that even though the NDA by its terms applied only to the RFP process, this Court should conclude that it barred HSBC from purchasing pounds ahead of the transaction. If that were true, how could HSBC ever have carried out the FX transaction without violating the NDA? It could not. HSBC's trades were in line with "conduct rules promulgated and endorsed by the [Financial Stability Board] and global central banks (including the U.S. Federal Reserve Bank) and embodied in the ACI Model Code and BIS Global Code." (ACIB14). Indeed, these rules "explicitly permit 'sourcing liquidity in anticipation of customer needs or hedging or mitigating exposure resulting from a client order.'" (*Id.* (quoting *Global Preamble: Codes of Best Market Practice and Shared Global Principles*, Federal Reserve Bank of New York, March 30, 2015, at 6)).

Because the NDA did not govern how HSBC could carry out the FX transaction, HSBC and Cairn entered into a subsequent agreement governing the transaction—the October 24, 2011 Mandate Letter. HSBC executed the FX transaction pursuant to that agreement and Cairn's December 7, 2011 trade instructions. Indeed, it is undisputed Johnson never misappropriated any Cairn information during the RFP process.

13

### b. *HSBC Never Violated The NDA*

Moreover, no confidence was ever betrayed.  The government misquotes and selectively quotes testimony concerning the supposed confidential information Cairn shared with HSBC and Johnson's understanding of how HSBC could use it. But Cairn's Scriven admitted "HSBC never disclosed any of [the confidential RFP] information to any third party."  (A-103).  The government is thus forced to suggest the alleged duty was breached when Johnson told *in-house HSBC* foreign exchange traders about Cairn's forthcoming order, characterizing these communications as coded "tips" to friends seeking a personal benefit by trading in their "own proprietary trading book[s]."  (GB9-10).  That is a total fiction.

Profits from HSBC traders' "proprietary" books go "to HSBC" itself and are no different from franchise book profits.  (A-144-45).  Accordingly, no HSBC trader personally benefits.  (*Id.*).  Moreover, HSBC was mandated to sell pounds to Cairn, and who else would buy the pounds if not HSBC's traders?  Contrary to the government's mischaracterizations of the record, Cairn fully expected HSBC's own traders to know about the transaction, and Johnson breached no "confidence" by instructing them to trade.  Scriven confirmed Cairn did not care how many HSBC traders were involved "as long as the trade got done," "whether it was 1 or 15" traders.  (A-116).  And the trades these HSBC traders made—whether in proprietary books or not—went to Cairn.  (SRA-4-8 (explaining "where those

14

pounds went" and concluding "they were all effectively transferred to [Cairn]" and "made up the hedge for the transaction with [Cairn]"); SRA-11 (depicting same)).

Neither does the use of "coded language" indicate any confidence was breached. (GB9). There was nothing nefarious about HSBC's use of code words, and the district court—which presided over the trial—didn't even mention that evidence in its opinion. Codes were used to prevent HSBC personnel from disseminating information about a transaction to uninvolved HSBC salespeople and third parties (exactly what Cairn sought to prevent). (SRA-9-10). In fact, Scriven admitted he was "aware that HSBC used code words to protect [Cairn's] transaction," and that this was a "common practice." (SRA-2-3). The government's suggestion also overlooks that HSBC used "a code name" for the transaction itself (GB5 (describing "Project Shine"), again to prevent the leak of any confidential information beyond currency traders.

The government misleadingly suggests the NDA was breached because Johnson conducted FX transactions involving "millions of pounds" "[i]n the weeks leading up to the transaction." (GB9). Of course he did. Johnson's job was to manage HSBC's currency trading desk. Both HSBC generally, and Johnson specifically, were routinely engaged in currency trading—including purchasing and selling Pounds—in the months leading up to the December 7, 2011 transaction. (*See* SRA-12-13). This was true even before HSBC signed the NDA

15

in October.  (*Id.*)  None of these earlier transactions could possibly have moved the market or harmed Cairn, and none evidence any misappropriation.  To suggest otherwise would be to suggest that the NDA prohibited HSBC from carrying out its currency trading business as a going concern.[5]

The government also misleadingly suggests Johnson "agreed that it would have been impermissible for him to benefit from his possession of Cairn's confidential information by buying pounds in advance of the transaction."  (GB8).  That was not his testimony.  What Johnson actually said was that such a trade would not be impermissible "if the trade's in connection with the execution" Cairn ordered, as the trades at issue here were.  (SA-218).  That is presumably why this Court previously concluded Johnson "was not convicted of frontrunning."  *United States v. Johnson*, 945 F.3d 606, 615 (2d Cir. 2019).

Nor does the insider trading case *United States v. Chow*, 993 F.3d 125 (2d Cir. 2021) (cited GB27), support the government's argument.  There, the defendant signed two NDAs with a publicly traded acquisition target during negotiations.  *See id.* at 139.  One explicitly protected the "[t]he fact of the [Parties'] exploration and evaluation of" the potential acquisition, but the defendant tipped an acquaintance with multiple status updates in clear breach.  *Id.*  That individual

---

[5] This underscores the extent to which the FX industry—in which currencies are bought and sold—is fundamentally distinct from the securities trading industry, a distinction the government's misappropriation theory ignores.

16

traded in the securities of the acquisition target before the public announcement, completing the insider trading scheme. That is not this case, where Johnson tipped no third party, and the trades (which were currency trades, not securities trades) were made to hedge the Cairn transaction and violated no laws or rules governing FX trading. By contrast, as *Chow* emphasized, SEC Rule 10b5-2 mandates that, for *securities* insider-trading-fraud, "[w]henever a person agrees to maintain information in confidence," "a 'duty of trust or confidence' exists." 993 F.3d at 139 (quoting 17 C.F.R. § 240.10b5-2(b)(1)).

### 3. The Parties' Arm's-Length Relationship Further Forecloses Any Duty

The government largely ignores Johnson's argument as to why the parties' arm's-length relationship further forecloses any fiduciary-like status as a matter of law. (*See* OB33-35). But even *Kosinski* recognized that an arm's-length "relationship is not by itself a fiduciary relationship," without the "addition of a relationship of confidence [or] trust." 976 F.3d at 148-49 (quoting *In re Mid-Island Hosp., Inc*., 276 F.3d 123, 130 (2d Cir. 2002)). The hallmarks of such a relationship are absent here.

#### a. Cairn Was A Sophisticated, Well-Advised Counterparty

The government falsely portrays Cairn—one of Europe's leading oil and gas companies, with income and assets in the billions—as a helpless entity that was wholly dependent on HSBC to execute a transaction in its "best interests."

17

(GB28). That is totally false. It is not true, for example, that Cairn "did not know what strategy would be best" and was reliant on HSBC to advise on the best strategy. (GB29). Nor is it true that Cairn "lacked FX expertise." (*Id.*).

Cairn retained Rothschild & Co., one of London's "premier investment banks," as its "financial advisor" for the currency exchange. (A-75-76, A-94, A-147). Rothschild had even advised Cairn on an earlier similar transaction involving a large currency exchange. (A-76, A-99-101). Rothschild provided Cairn with expert advice regarding the various FX transaction methods available and recommended a fix trade as the optimal choice. (OB11-12). Cairn acted based on Rothschild's recommendation, not HSBC's.

It doesn't matter that Cairn was "looking for" a transaction in "the best interest of Cairn." (GB29). Such an understanding does not establish any fiduciary-like relationship; it simply reflects Cairn's obvious unilateral, aspirational goal. *See Economy v. Borg-Warner Corp.*, 829 F.2d 311, 314, 316-17 (2d Cir. 1987) ("wishes" or "desires" are "not actionable"). In arguing otherwise, the government relies on puffery and platitudes in HSBC's RFP response (GB5-6), ignoring that Scriven admitted these statements were part of a "sales pitch" (A-116-17). Such "salesman's banter" cannot transform "an arms-length relationship" into "one of special trust." *United States v. Litvak*, 889 F.3d 58, 69 n.13 (2d Cir. 2018). Moreover, although Scriven claimed HSBC had a "best execution duty not

18

to influence the market adversely with our trade," he admitted this was not "a term" but "just an expected behavior."  (A-110).

The government further ignores that throughout Cairn's dealings it repeatedly acknowledged HSBC was "not responsible for providing" Cairn with "advice," was "acting for its own" benefit and not Cairn's, and that Cairn was "solely responsible for making its own independent appraisal" of the transaction, which it did.  (A-211, A-204).  Even if Cairn viewed HSBC as "provid[ing] [it] with support," "the government cites to no authority that supports such a broad definition of 'agent.'"  *United States v. Hoskins*, 44 F.4th 140, 151 (2d Cir. 2022).  And it overlooks that "absent an *explicit agreement to the contrary*," a bank "ha[s] no fiduciary obligation to provide [a customer] with the best execution for [an] FX trade[]."  *Negrete v. Citibank*, N.A., 759 Fed. Appx. 42, 46 (2d Cir. 2019).

### b.  *HSBC Did Not Control Cairn Or Its Assets*

The government is also incorrect in suggesting that HSBC exercised any "superiority and influence" (GB25) over Cairn.  The parties freely bargained throughout as arm's-length counterparties.

Rothschild asked HSBC what would happen in a fix transaction, and Johnson described how HSBC would accumulate pounds ahead of the fix and make its money based on the difference between the price it paid for pounds and the eventual fix price.  (A-274-75).  HSBC's pitch warned Cairn that a fix trade

19

"fully exposed [Cairn] to any adverse [foreign exchange] movements" and that Cairn would be "taking" on "risk by trading against a fix." (A-178, A-180).

Before Cairn would commit to proceeding with HSBC, it insisted on a memorialized agreement drafted by Rothschild—not HSBC—and approved by Cairn's counsel. (OB12). That Mandate Letter committed HSBC to converting up to $4 billion at Cairn's request, but *gave Cairn ultimate discretion* to select one of three conversion methods.

The government also disregards *Allen v. Credit Suisse Sec. (USA) LLC*'s holding, under materially indistinguishable circumstances, that HSBC did not "perform[] a fiduciary function" when "amass[ing] large proprietary currency positions" to sell to sophisticated customers like Cairn "before or during the fixing window." 895 F.3d 214, 220, 223 (2d Cir. 2018). It argues *Allen* was limited to the ERISA context, reiterating the district court's erroneous reasoning while ignoring the reasons why *Allen* applies here. (*See* OB35).

The government next tries to spin *Allen*'s language that "a relationship of trust is established when one acquires possession of another's property"—here the purported confidential information— "with the understanding that it is to be used for the owner's benefit." (GB35 (citing *Allen*, 895 F.3d at 223)). But the government overlooks *Allen*'s caveat that "[t]he principle is not, however, without limit," as "[a]n entity must exercise the requisite degree of control and discretion to

20

be held liable."  895 F.3d at 224.  Here, however, the government cannot prove the

requisite control or discretion, and its attempts to do so misrepresent the parties'

conduct and understanding, and the context in which the transaction took place.

### c. *Cairn Withheld The Relevant Information*

The government also ignores that Cairn withheld critical information about

its anticipated transaction from HSBC until the very last minute.  This is

significant, because the government argues "the timing of the FX transaction" in

particular was "vitally important," "because that information risked moving the

market against Cairn."  (GB19).  But Cairn did not even share that information

with HSBC or Johnson.  Although Johnson made clear HSBC needed a "minimum

of two hours" advance notice on December 7, 2011 to properly conduct the

transaction (A-274-75), Cairn withheld both the timing of its anticipated

transaction and its plan to use a fix trade until immediately before placing its order.

Indeed, Cairn did not disclose the full details of its order until 32 minutes before

the fix.  (OB14-15, A-218, A-226, A-105, A-118-19).

Thus, it was HSBC that was left in the dark, not Cairn, which never "ceded"

control (GB34-35) of its information to HSBC.  The government is silent on the

fact that this course of dealing is consistent only with an arm's-length relationship,

and "not consistent with the view that [HSBC] was [Cairn's] agent." *Litvak*, 889

F.3d at 71.

21

### 4. The Government Has No Persuasive Responses To Johnson's Remaining Arguments

The government offers no persuasive responses to Johnson's remaining legal arguments, including that the district court improperly relied on irrelevant extrinsic evidence (OB36-40), flouted Supreme Court guidance on statutory interpretation (OB40-41), violated due process (OB41-44), and ignored that disclosure forecloses liability under the misappropriation theory (OB44-45).

*First*, the government does not even attempt to defend the district court's erroneous reliance on extrinsic evidence to sidestep the ISDA's and Mandate Letter's clear language and submit the duty question to the jury. (*See* OB36-37). Rather, it suggests this Court should affirm "even without resorting to so-called 'extrinsic evidence,'" reiterating its position that the NDA alone established an "affirmative confidentiality obligation" regarding the transaction. (GB35-36). That is a telling admission that the district court's reliance on extrinsic evidence is not defensible. The government's alternative argument fails for the reasons discussed in Point I.B.2, *supra*.

*Second*, the government tosses aside the Supreme Court's repeated "caution," *Ciminelli*, 598 U.S. at 315, to narrowly construe the federal fraud statutes, claiming the Court's repeated warning is merely "a general principle … of little relevance to the analysis here" (GB36). It instead posits the test for fiduciary status "is subject to settled standards" that "implicate[] no 'constitutional

22

problems.'"  (GB36).  It is remarkable that the government would say this, especially after *Percoco*'s specific and very recent pronouncement on avoiding "vague" tests for determining whether a fiduciary relationship exists.  Nor is the idea that amorphous fiduciary status tests implicate serious constitutional problems new.  This Court's own precedent requires consideration of constitutional principles in criminal misappropriation cases: "[A]n elastic and expedient definition of confidential relations … would offend not only the rule of lenity but due process as well," and "[m]ore than a perfunctory nod at the rule of lenity, then, is required."  *Chestman*, 947 F.2d at 570.  Yet the government ignores *Chestman* too.

*Third*, the government sweeps aside overwhelming evidence that Johnson's conduct was consistent with industry practice and commercial expectations (*see* OB41-44) by claiming that "nothing in the prosecution here calls the legality of those trading practices generally into question" (GB37).  That is not a serious argument.  As explained in Johnson's opening brief and by the ACI, Johnson had no fair notice that his conduct could be criminal, and the government's misappropriation theory here criminalizes routine FX trading authorized by industry best practices.  (*See* ACIB14-16, ACIB26-30).

The government falsely claims Johnson's conduct was of a different kind—a form of classic fraud—peppering its brief with pejoratives like "tipped" and "front-

23

running" to liken the conduct to insider trading of securities. This reflects a core misunderstanding of the regulatory regime, the currency markets, and the nature of the transaction. It remains undisputed that no law prohibited the currency trades the government describes as "frontrunning"; this was not insider trading of securities, nor did it involve exchanging currency for a retail customer. In arguing otherwise, the government continues to ignore this Court's prior conclusion that Johnson "was not convicted of frontrunning," *Johnson*, 945 F.3d at 615, even though it is law of the case, *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009).

Nor is the government correct in arguing that Johnson's due process argument was foreclosed by the Court's decision on direct appeal. This Court never decided the issue as it relates to the standardless misappropriation theory the government posits here. Instead, the Court rejected the argument because of the now-invalid right to control theory. It observed it "need not express an opinion on the law relating to frontrunning in 2011," because "[a] defendant who executes a fixing transaction engages in criminal fraud if he intentionally misrepresents to the victim how he will trade ahead of the fix, thereby deceiving the victim as to how the price of the transaction will be determined." *Johnson*, 945 F.3d at 616.

**C. Disclosure Forecloses Liability Under The Misappropriation Theory**

The government also fails to rebut Johnson's argument that his "disclosure" that HSBC would purchase pounds ahead of the fix "forecloses liability under the

24

misappropriation theory." *O'Hagan*, 521 U.S. at 655.  It is undisputed that

Johnson disclosed how HSBC would carry out the FX transaction.  He disclosed

that because HSBC was otherwise earning no fee and taking on substantial risk,

pursuing and keeping some upside was the only way for HSBC to earn a profit.

(A-274-75).  Johnson told Cairn:

> [Y]ou know our aim is to make a small amount of money
> out of this clearly because that's … our business….  So if
> … we just accumulate the position and then just try and
> control the market over the last 20 minutes, so that we
> give you a fair price and then we have something that
> you know, we keep Dipak and the bosses happy.

(A-275).  HSBC also warned Cairn that the fix "fully exposed [Cairn] to any

adverse [foreign exchange] movements" and was among "the riskiest of the

strategies to consider," because Cairn would be "taking" on "risk by trading

against a fix."  (A-178, A-180).  Cairn clearly understood HSBC stood to profit

from the fix transaction, because it asked if it could "share some upside," (A-277),

and Johnson "expressly advised" Cairn and its adviser that HSBC would profit by

"buying ahead" (A-90-91).

    Remarkably, the government falsely claims "Johnson and his team …

inflated their profits by approximately $7 million [by] increas[ing] the price Cairn

paid for pounds" while hiding their plans.  (GB2).  But in reality, as it

acknowledges later in its brief, "HSBC *overall* made approximately $7 million."

(GB11 (emphasis added)).  It never "inflated" its profits, which represented only

25

0.2% of the value of the $3.5 billion transaction.  *See Johnson*, 945 F.3d at 611.

This "small amount of money" is exactly what Johnson disclosed HSBC would

stand to gain.  Nor is there any evidence HSBC could have purchased pounds with

less influence on the fix within the time allowed by Cairn's orders.  Tellingly, the

government does not dispute that its own experts admitted that how HSBC traded

was the "normal way" to trade a fix.  (OB6-7).

   HSBC did raise the possibility of "drip feed[ing] the market" (A-177), but

the government cannot seriously contend that was a misrepresentation.  Cairn

*rejected* the "Order at-best" trading method to which this drip-feeding comment

referred[6]—since (in Rothschild's words) it "le[ft] little control for Cairn over either

the timing of completion" of the exchange "or the price at the time of execution."

(A-207).  Cairn instead instructed HSBC to use the fix and sell the entire $3.5

billion within a limited time range—violating the Mandate Letter's two-hour

notice requirement—fully aware that this would "create turbulence" and "market

disruption owing to a compressed execution window."  (A-284, A-208, A-274-75).

Cairn presumably withheld this information because it fully understood a key

feature of fix transactions:  "Cairn [was] not in control of [the] timing" of HSBC's

trades.  (A-208).

---

[6] Khot testified that the "drip feed" comment "refers to an at-best" strategy.  (SRA-1).

26

II.   **Even If The Misappropriation Theory Was Legally Valid, There Is Overwhelming Doubt As To Whether The Jury Would Have Convicted On Misappropriation Alone**

Even if the district court properly submitted the fiduciary duty question to the jury, the evidence raised serious doubt as to the existence of a fiduciary-like relationship.  The duty element of the misappropriation theory was hotly contested at trial, because the parties' agreements and arm's-length conduct negated a fiduciary-like relationship.  *See* Point I.  That is more than sufficient to undermine confidence in the outcome.  (OB47-48).  In arguing otherwise, the government's brief reasons from an incorrect harmless error standard, and otherwise fails to rebut Johnson's additional evidence of harmfulness.

### A. The Government And The District Court Applied An Incorrect Harmless Error Standard

The applicable standard is whether "the verdict and the trial evidence here give [the Court] a high degree of confidence that a properly instructed jury would have convicted" on the valid theory.  *Colotti v. United States*, 71 F.4th 102, 116 (2d Cir. 2023).  Stated differently, the question is whether "there is ample evidence in the record that a properly instructed jury would have [convicted] beyond a reasonable doubt."  *Stone v. United States*, 37 F.4th 825, 832 (2d Cir. 2022).  The government completely ignores this precedent.  It instead claims that a looser standard applies.

27

The government cites the Supreme Court's observation in *Brecht v. Abrahamson* that this looser standard "is better tailored to the nature and purpose of collateral review than the *Chapman* [beyond a reasonable doubt] standard." 507 U.S. 619, 636 (1993). But *Brecht* was limited to the 28 U.S.C. § 2254 context and does not govern federal appellate review of federal district court decisions. The holding stemmed from "comity and federalism" concerns, as the Court noted the illogic of "requir[ing] federal habeas courts to engage in the identical approach to harmless-error review that *Chapman* requires state courts to engage in on direct review." *Brecht*, 507 U.S. at 636. Those concerns are not at play here.

Indeed, where—as here—states' interests are not implicated, "[t]here has been considerable debate about the exact contours of [the] harmless-error analysis in the collateral context." *Stone*, 37 F.4th at 829. And while neither the Supreme Court nor this Court "have decided which standard applies," *Kassir v. United States*, 3 F.4th 556, 564 n.43 (2d Cir. 2021), this Court clearly favors the *Chapman* standard in proceedings like this one. *See Stone*, 37 F.4th at 831; *accord Colotti*, 71 F.4th at 115; *Gomez v. United States*, 87 F.4th 100, 107 (2d Cir. 2023).[7]

That standard is particularly appropriate where—as here—the Court never decided the misappropriation arguments Johnson first made on direct appeal

---

[7] To be clear, the *Ciminelli* error was harmful even under the looser *Brecht* standard proposed by the government.

28

(because it affirmed on the now-invalid right to control theory alone).  This is not an instance in which a defendant is seeking a second bite at the apple through collateral review.

The government otherwise ignores Johnson's argument that the district court erred in applying a sufficiency of the evidence standard to review harmfulness below.  (OB51-52).  Even under *Hedgpeth v. Pulido*, "[t]he inquiry cannot be merely whether there was enough to support the result in the absence of the error." 555 U.S. 57, 66 (2008) (Stevens, *J.*, dissenting) (cleaned up).  Rather, the Court must determine if the error itself introduces doubt.[8]  For many reasons the government does not care to address, the *Ciminelli* error was clearly not harmless.

## B. The Government's Arguments At Trial Underscore Harmfulness

Johnson's opening brief discussed at length how the government repeatedly relied upon the erroneous instructions and the invalid "right to control" doctrine to invite the jury to convict on that theory alone.  (OB48-49).  The government has no response.  But it remains the case that the government's reliance on the invalid theory at trial "heightened" the "risk of an improper conviction based only on [the invalid theory]."  *United States v. Joseph*, 542 F.3d 13, 18 (2d Cir. 2008)*, see also United States v. Sabhnani*, 599 F.3d 215, 240 (2d Cir. 2010).

---

[8] Because the government misconstrues the applicable harmless error standard, it dismisses out of hand Johnson's other cited precedent (GB30-31), but that caselaw remains persuasive here (OB26-27, OB49-51).

29

**C. The District Court Itself Expressed Doubt As To The Misappropriation Theory, Which This Court Confirmed When Granting Bail Pending Appeal**

The government unpersuasively tries to reframe the district court's own doubt when it observed the existence of a fiduciary-like relationship was a "knotty" issue.  The government states the issue the court was describing was not whether a duty existed, but whether that issue "was a matter for the jury to decide, or whether Johnson did not owe this duty as a matter of law."  (GB40).  That is a distinction without a difference.  If the evidence was close as to whether "Johnson did not owe this duty as a matter of law," it could not have been "ample" enough to prove a duty beyond "a reasonable doubt," *Stone*, 37 F.4th at 832, or with "a high degree of confidence," *Colotti*, 71 F.4th at 116.

And this Court granted bail pending appeal when Johnson made the same arguments on direct appeal, holding that the arguments raised a "substantial issue"—a "close question."  (OB53).  Although that holding is "not binding on this panel," it provides "a significant reason to believe" the misappropriation theory was flawed, warranting reversal.  *United States v. Mattis*, 963 F.3d 285, 298 (2d Cir. 2020) (Newman, J., dissenting).

**D. The Jury's Verdict Shed No Light On Misappropriation**

The government also ignores Johnson's argument that in assessing harmfulness, the Court should consider the fact that the verdict here did not reveal

30

anything about whether the jury would have convicted on misappropriation. (OB54-55). The district court's conclusion otherwise was so flawed the government does not even attempt to defend it.

In *Colotti*, for example, the Court concluded the jury's verdict shed light on whether it would have convicted on the legally valid theory, because the jury's verdict combined with the court's instructions made it "highly unlikely that the jury would have premised the … convictions" on the invalid theory. 71 F.4th at 117. This established a "high degree of confidence" in the outcome. *Id.*

The instructions here reveal nothing about whether the jury could have convicted on misappropriation and lend no such confidence. (OB54-55). Instead, the right to control instructions diverged from the misappropriation instructions in critical respects—including on whether a fiduciary relationship was even required, because right to control requires no such duty. Indeed, it is more likely the jury took the more direct and less onerous route to convict Johnson on right to control alone. After all, that "theory treats mere information as the protected interest" and "makes a federal crime of an almost limitless variety of deceptive actions." *Ciminelli*, 598 U.S. at 315.

Here, grave doubt is obvious, because it would have been far easier for a deliberating jury to convict under the broader right-to-control instructions given the equivocal evidence on fiduciary relationship.

31

## **CONCLUSION**

The Court should reverse and remand for entry of an order granting the writ.

Dated:  November 27, 2024
      New York, New York

                             Respectfully submitted,

                             /s/Alexandra A.E. Shapiro
                             Alexandra A.E. Shapiro
                             Jason A. Driscoll
                             SHAPIRO ARATO BACH LLP
                             1140 Avenue of the Americas
                             17th Floor
                             New York, New York 10036
                             (212) 257-4880
                             ashapiro@shapiroarato.com

                             *Attorneys for Petitioner-Appellant*
                             *Mark Johnson*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. The undersigned counsel of record for Petitioner-Appellant Mark Johnson certifies pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1 that the foregoing brief contains 6,994 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the Word Count feature of Microsoft Word 2024.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2024 in 14-point font of Times New Roman.

Dated: November 27, 2024

/s/Alexandra A.E. Shapiro
Alexandra A.E. Shapiro